Good morning, and may it please the Court. My name is John Klein, and I am the counsel for the appellant, Eve Mazzarella. I'd like to reserve a couple of minutes for my buddy. There are a lot of issues in this case, but what I want to focus on today are the Brady issues and, to the extent time permits, the search issue that came up as part of the Brady process. This case represents an example of what Chief Judge Kaczynski referred to in his dissent in Olson as an epidemic of Brady violations, but this is a particularly remarkable example. We have here now four witnesses for the prosecution for whom Brady impeachment material was suppressed. The fourth came up recently. It's the subject of a motion that's pending before the panel. We've asked to supplement the record. But this has played out now over a period of a year, year and a half, and it's been one witness after another. The first witness, as the Court no doubt recalls, was Ms. Brown, Kim Brown. That issue came up at the trial after Ms. Mazzarella's trial, where Ms. Brown was being asked about other matters. She disclosed that she had a oral immunity agreement with the government. The government, in fact, confirmed that that was the case, confirmed that it had not been disclosed in Ms. Mazzarella's previous trial. In the course of that proceeding, the Mark case, Ms. Brown also disclosed, and this is, of course, the Fourth Amendment issue, that at the request of two government agents, she had secretly remained in Ms. Mazzarella's employ and at their direction had copied 3,000 to 4,000 pages of material and turned it over to the agents. That is important both because it would have been useful to impeach her and because it gives rise to a Fourth Amendment search-and-seizure issue. There was no warrant, of course, that justified her at the agent's direction copying those thousands of pages of material. So that was Ms. Brown. Shortly after the Ms. Brown disclosure, the prosecutor, Mr. Pugh, disclosed an e-mail involving a second witness named Alicia Hanna, in which Ms. Hanna had expressed an interest in working for the FBI. Ms. Hanna testified at trial. She was a very compelling witness because she seemed completely impartial. She was a sort of a summary, almost an expert witness on the bank fraud count. She had conducted an investigation on behalf of the victim bank. She labeled Ms. Mazzarella as one of the fraud-feasers who had committed the fraud against the bank. There was no basis at trial on the basis of that. I mean, you can summarize all you want, but your time is just going to run out. I would suggest maybe we're familiar with everything you've submitted. Why don't you just dive right in. Tell us why you think any of this warrants reversal or a remand. Well, the question comes down to materiality, and it's important because for a couple of reasons. First of all, materiality is going to be viewed collectively. We're now talking about four prosecution witnesses. This was a case against Ms. Mazzarella that depended primarily on the testimony of a cooperator named Skip Young. I think if you had something on him, we might be in business on materiality. I have to tell you, none of these witnesses, in terms of the actual testimony that they offered at trial, they don't strike me. None of your Brady complaints I'm going to put aside the Fourth Amendment issue for a second, but none of your Brady complaints strike me as rising to the level of something that's material because each of these witnesses either was not the critical one on a, you know, a particular element of the offense or was their testimony was corroborated by documents. Well, first, let's talk about the documents first. I don't think their testimony was corroborated so much by documents, but beyond that. What about Hannah? Really? Hannah essentially did a — Summarizing. Basically, what she's doing is just summarizing the documents. She summarized the documents, and then she declared that Ms. Mazzarella and Mr. Grimm had committed a fraud against Amtrust. That was pretty powerful testimony on the bank fraud counts. Why couldn't you tell that from the documents? Well, that was for the jury to conclude. What you don't need is someone who is an expert to come in and pronounce that Ms. Mazzarella committed fraud. There was a serious question in this case about Ms. Mazzarella's role. She was distinct from Mr. Grimm. She had her own office. And there was a real question about her knowledge of what this program of Mr. Grimm was up to. The real issue here was not the overall program. It was whether Ms. Mazzarella knew that the investors were filling out the applications falsely. That was really what this case came down to. Right. That's why I say if you had something on this guy Skip Young, that would be different. But here's the problem, Your Honor. When you look at this, it's not a sufficiency of the evidence question. The issue is materiality. Skip Young was impeached. The jury was free to disbelieve him. You had all these other witnesses who lined up to really almost all these witnesses with the exception of Hannah were focused on Ms. Mazzarella. Ms. Brown had worked for Ms. Mazzarella. Ms. Wolfe had done transactions involving Ms. Mazzarella. Ms. Hannah talked about Ms. Mazzarella and Mr. Grimm. And you had, and then finally this last witness, Channa Suderi, the one who just came up, was entirely a Mazzarella witness and designed to paint the picture of Ms. Mazzarella as a cheater. That was the whole point of that testimony. Was a victim, right, an alleged victim? Suderi claimed to be a victim. He claimed that he had been victimized both by the way she had negotiated the transaction, but then he also had this little additional point that she had promised him that he could remain rent-free. Then she, according to him, reneged on that promise, and he would never do business with her because she had. No, I know, but there were plenty of other victims who testified. That's my only point. It's not like this was the only victim who came forward. But this was a victim who came forward to point the finger at Ms. Mazzarella having cheated him specifically. And that was important. You add these witnesses together. You've got four witnesses now. And by the way, I should add. We have four witnesses so far. There has never been any sort of inquiry in the district court about the extent of the government's Brady violations here. I wrote a letter to Mr. Levitt, my friend over here, a year ago, and asked him to personally undertake the sort of Brady review that should have been conducted before the trial. And when I got back about three weeks later, there was a letter saying that Mr. Pugh and Ms. Griswold, the trial investigators, had reviewed the file and there was no additional information. Well, we know now that that wasn't correct because we have now the Severi revelation. So we're talking about four witnesses here, but I have absolutely no confidence. I don't think this Court should have confidence that that is the extent of the Brady violations. Roberts. Let me ask you just what we're supposed to do with respect to this last witness. Yes. Do you think the way we left things is that we deferred ruling on the motion to supplement the record. Right. Right. So it's we can go either way. But what's your position? Do you want us to accept that material into the record and then just decide in the first instance whether this changes the game? Or do you think we're required to send it back to the district court to rule on that in the first instance? No. I don't think you're required to send it back. I would prefer that you accept it into the record. Now, I do think that there should be a further inquiry in the district court. And now let me be clear. I think there is plenty right now to vacate the conviction and send it back for a new trial. The Court may prefer not to vacate the conviction, but to send it back for the evidentiary hearing that we've asked for over and over and that's never been held. Either way, there should be an inquiry in the district court, which might encompass what happened with Sidiri, but would also encompass a more complete inquiry into Brady and discovery compliance generally. Counsel, if you were ruling, if you could write the ruling for the court and it was to remand to the district court for an evidentiary hearing, what precisely would you tell the district court had to be determined? The following, Your Honor. First of all, I would require discovery to begin with into the district court's Brady compliance, and discovery would encompass who the agents were, what they produced, what files they had, and so on. Second, I would have an evidentiary hearing at which the line prosecutors, Mr. Pugh and Ms. Griswold and the FBI agents, and there were a number of them, would be required to testify so that we could get to the bottom of exactly what documents they all had and how those documents were handled. And then the next part of the discovery into further potential Brady violations or does that get to the Fourth Amendment issue you're talking about? Well, I'm going to get to the Fourth Amendment issue, but that would certainly be part of it. But what I'm talking about so far in response to Judge Gould's question is the Brady violation. We've we've there has never been the sort of inquiry that the government itself in the Ogden memorandum that's included in our materials says ought to be conducted before trial. There's never been that sort of inquiry either before trial or after trial. So we don't know the full extent of the problem. So there should be discovery. There should be an evidentiary hearing at which the prosecutors and the FBI agents would testify and we would get to the bottom of that. Then we have the Fourth Amendment issue. And I will, I will Can I just ask first, is there a case in which we've ordered the kind of evidentiary hearing on Brady discovery that you're describing? I know we've sometimes remanded to say you need to do discovery again to make sure you got everything. But this kind of hearing where they'd actually have to testify and explain what they've done, has that happened? I know that we cited a case in our briefs, which I it was from the D.C. Circuit, and I think it was called Young, where there was an inquiry like that. I think in I think in Kyle's versus Whitley, the Supreme Court case, there was that sort of inquiry. I thinking about this Court's cases, I none comes to mind. But I don't think it's uncommon to when there is a, you know, prima facie problem with Brady, as there clearly is here, whether Your Honor believes it's material or not. It is, I think, now obvious that there was a lot of material that was never found and never disclosed. When that sort of thing happens, there has to be some sort of inquiry, it seems to me, and it has never happened so far. So and then we get to the Fourth Amendment issue. And on the Fourth Amendment issue, again, keep in mind what happened here. According to the government's witness, Ms. Brown, testifying under oath, and Mr. Mark as well, testifying under oath, they copied 3,000 to 4,000 pages of material secretly at the government's request and turned it over to the to the Is there any allegation that Brown didn't have access to these documents in the normal course of her employment? No. Now, she certainly didn't have permission to copy them and turn them over to the government. And she had to act, you know, sort of covertly. Mr. Mark would keep an eye out for Ms. Mazzarella to make sure she wasn't detecting it. But why couldn't we find that as someone who had access to these documents in her regular employment that she could essentially consent to a search? I don't think she had the authority to consent to a search over Ms. Mazzarella's premises. If she had access to all of those premises and was using those documents in her work, then why was there sort of an expectation on Mazzarella's part that that was private as to Brown, and Brown wouldn't have the ability to show the documents to the government? Well, if Brown had entirely voluntarily copied these documents and shown them to the government, that would probably be a tort. It would probably be an invasion of privacy or something like that. But it would be a private search and, therefore, probably would not implicate the Fourth Amendment. And there were some documents at the very beginning that Brown copied on her own. And turned over to the government. And there's no Fourth Amendment issue as to those. But the mere fact that an employee might have access to documents does not permit the government to task that employee to go in and copy at the government's request materials that the government could not otherwise obtain without a search warrant. There's no suggestion here that the government could come into these premises without a search warrant and take these documents. I follow you on that. But I guess what I the question I have relates to the kind of evidentiary hearing you want to occur. Yes. Because ---- I'm sorry, Your Honor. And I let me tell you exactly what I think the issues are. Issue number one would be whether Ms. Brown meets the requirements in the Reed case to be considered a government agent. I think the evidence is pretty clear on that. Let's assume that's met. But I'm just saying in terms of ---- Issue number two would be the use made of the document. Right. Now, the prosecutor has, in an assertion that has not been tested in any sort of adversarial way, has asserted that none of those documents were placed into evidence at trial. Let's assume that that's true, although I don't concede it by any means. There is still the question of other forms of use. We cited the Murray case, and there are all kinds of other non-evidentiary uses, for example, to get the search warrant that led ---- because keep in mind what happened here. Ms. Brown conducts this covert search with the 3,000 to 4,000 pages. The government, months later, gets a search warrant and searches the office and seizes a bunch of documents which may or may not be the same documents. So an important question is what happened to those 3,000 to 4,000 pages of documents? Were they, for example, used as the basis to obtain the search warrant? If they were, that's an important Fourth Amendment question. But none of that has been fleshed out in any sort of evidentiary proceeding because, again, the district court declined to hold it. OK. So that's ---- Oh, go ahead. No, go ahead, Judge Gould. So, counsel, so you would want a full hearing on what was a fruit of the first search that Brown did? Yes, Your Honor. Yes. Assuming she was acting on behalf of the government, then what were the fruits of what she uncovered there? That is correct, under the analysis of the Murray versus U.S. case. That would be, certainly be one of the issues to be covered. Well, I don't want to cut off Judge Gould's line of question if you have more. No, I think I covered my clarification. OK. Well, I mean, the first prong of that, it strikes me as we could probably figure that out ourselves by looking at the, well, or the district court, by just looking at the search warrant affidavit. If there's no mention of any of these documents, right, that were obtained from Ms. Brown, then under Murray, I mean, I don't think you're going to be able to prove that somehow the government wasn't going to pursue a search warrant, but for, you know, this initial showing of documents. They were already on to your client. Your Honor, at this point, I don't know what we're going to be able to prove. That's the whole point of having a hearing. We know that they wanted these documents for some reason. They weren't just on a lark. They got 3,000, 4,000 pages of material, and they did something with it. Right. OK. But are they mentioned in the search warrant affidavit? You're, you don't know off the top of your head. I've read the search warrant affidavit. I don't think they say these are the documents we got from Kim Brown. You don't know what the documents are, do you, that they got from Brown? No. They, we've never seen them. Again, there's never been, this came out post-trial. There's never been any sort of inquiry into it at all. We think that they are just from allusions that Ms. Brown makes in the course of her, of her describing this, that they are, relate to particular borrowers. But we don't know. We don't know. OK. But so let's, so one issue is whether the, the search warrant itself was tainted by this, what you could say is an illegal Fourth Amendment search. What else besides that do you think might be potential fruit? Well, for example, suppose that the government gets these 3,000, 4,000 pages of documents and uses those documents to find other potential victims who end up testifying in trial. Suppose that they use those documents to suggest to people that they might have criminal problems. No, no, I know, but that, it seems to me, if I remember our case law, that's your initial burden, to show that, hey, there's a likely causal nexus between the government seeing these documents that it shouldn't have seen and X, Y, or Z. Your Honor, it may be my burden. I've never had a chance to meet it. This didn't come out until after trial. There's never been a hearing. There's never been any opportunity to meet whatever burden I may have. That's the unfairness of this process. That is the unfairness here. And I take it that's aggravated by the fact that you still don't know what those documents consisted of? We don't. We don't. And not for lack of trying, and let me be clear about that. I mean, we have asked the district court at every juncture to hold a hearing, to get to the bottom, both of the Brady issues and the search issues, and there's been, let's just say nothing has happened. So it may be our burden, Your Honor, but you've got to give us a chance to meet it respectfully, and we haven't had that chance. Okay. Do you want to save time? Counsel, are you going to hold some time for rebuttal? A couple of minutes, yes, Your Honor, and I've got that time now. Yeah. Okay. Thank you. It's a good place to stop. Let's hear from the government, and we'll give you a chance to respond. All right. May it please the Court. Peter Levitt for the United States. Your Honor, Kim Brown doesn't know what documents she supposedly took. Kim Brown doesn't know what she took. Well, your agent knows, right? You would hope that he kept some record of what was turned over, if it's 3,000 or 4,000 pages of material. Your Honor, Agent Randall said, I don't recall receiving any documents that they surreptitiously took from Distinctive. Remember, Kim Brown and her then-fiancé, David Mark, went to the FBI for the first time while the Net was closing in around Mazzarella. They went in and talked to the FBI. Kim Brown testified in the Mark case in approximately August, September, October of 07, we were making a lot of copies. This seems to be before she even went to the FBI. But let's talk about, we have Kim Brown saying, someone told me, make a whole bunch of copies, and she did. A, we don't know what they are. She doesn't know what they are. B, none of them, none of the 1,343 exhibits that were seduced at trial came from documents obtained by Kim Brown. You don't know what they are. How do you know that? How do you know that they didn't get mixed in with other things and become exhibits? Because the AUSA who tried the case said that these were all derived from the search warrant that was executed after March 15th. Which may have been obtained by the view of these documents beforehand. No? I mean, I know what you're saying. I hear you. But I'm just saying, you're asking us to basically take it on faith. We have nothing before us from which we can accept or confirm, rather. Let me put it that way. We have nothing before us from which we confirm that what you're saying now is true. And so why don't we have to send this back, at least for there to be an inquiry? You may well end up being right on all of this, but how are we supposed to know that right now? Well, I would say two things, Your Honor. First of all, the district court found, the district court that presided over the 10-week trial found that, moreover, even if Brown were acting as a government agent, and the district court found she wasn't, and did copy and produce those documents, those documents were not used as a basis for the government's case-in-chief. Additionally, to the extent the defense argues, pardon me, additionally, to the extent they wish to show Brown's bias in favor of the government, the extensive corroborating evidence of her testimony --- I'm with you. Okay? I've already said that. I'm with you on that one. I don't know if my colleagues are, but I'm more focused just on the unknown with respect to the Fourth Amendment issue. That just strikes me as it's a complete black box right now. Your Honor, I would respectfully and slightly disagree with Your Honor's characterization. I would say in this case, as a threshold matter, we don't have evidence that Kim Brown was acting as a secret government mole. We have Kim Brown's recollection that at some indeterminate point in time, they said go back and make copies, and that's what I did. That's all we have. All of this. Mr. Levitt, if we have that, you know, why isn't that the proper subject of an evidentiary hearing where the district court would make findings of fact? You know, she says, they said, get all the documents you can. Somebody should make a finding on that. And in terms of your argument you just presented, I do recall the district court saying nothing was submitted in evidence that she produced. But I don't recall the district court addressing the issue, whether there were any fruits of that, so that if it was fruits of her search, so if it was a search for the government, and if it was in violation of the Fourth Amendment, wouldn't there have to be findings about fruits? Then the court didn't do that, right? Your Honor, I don't believe the court — I do not believe the court expressly made a finding on fruits. However, I would respectfully submit, A, that the court found as a threshold matter she's not a government agent. She was doing this out of her sense of doing what was right. Second, that I believe it can be fairly inferred from Judge Hunt's order that none of the trial evidence was tainted by whatever it was Kim Brown may or may not have copied. Let me ask you the same question I asked your friend on the other side. Assuming that the panel disagrees with your analysis and wants to remand to the district court for some sort of evidentiary hearing, assuming that were to be done, what would the language of remand ask the court to do? I don't, off the top of my head, know how to craft such an order, Your Honor. I believe the district court, which presided over this case for 10 weeks, acted within its discretion in not cutting anybody off, but in not holding an evidentiary hearing on matters that, in light of 7,200 pages of damning, inculpatory evidence, decided were immaterial in any event. I would imagine this Court could order the district court to conduct an evidentiary hearing, and the trial prosecutors, one of whom I note parenthetically, now works for Grimm's attorney, the public defender's office of the District of Nevada, and we could start bringing in FBI agents and prosecutors and former prosecutors, and then Judge Hunt would be asked again to make findings. Short of that, I simply don't know. Was there any basis for the judge's finding that this didn't taint the evidence that was submitted at trial, if there was such a finding? There was no such finding, Your Honor. However, Judge Hunt found clearly and unequivocally that none of what was presented was derived from Kim Brown, and I understand Judge Watford's concern. Affect was introduced or used at trial. And I --- How could he find that? I mean, how would he have known that? I believe he based his finding on the uncontested affidavit of the former prosecutor that none of these materials were used at trial. Standing here right now, I am not able to parse out, because we don't know, what Kim Brown copied. Did she just copy investor files? She only was one of the other witnesses on Count 1, one of the many other witnesses on the conspiracy, and she talked about her own deal, her own straw purchase on Count 11, which was one of the many mail fraud convictions. I can't parse out what she may have taken and how, if at all, that affected, tainted, or overlapped with the trial exhibits. But I don't know how the district court is going to know, because I don't know how Kim Brown is going to know. If she didn't know last time, I doubt her memory would have gotten better. Counsel, would the government have a record of what Brown gave them? I don't believe any such record exists, Your Honor. And I would again point to what FBI agent Randall testified in the Mark proceeding, clerk's record 179 there at page 61. I recall seeing a file that she did bring in some documents that were related to her loans, and at a later point in time, at a later point in time, I don't recall receiving any documents that they surreptitiously took from Distinctive. Okay, so he says there wasn't a later disclosure of thousands of documents, and the judge said she wasn't an agent of the government. But assuming there's an issue of fact on those things, don't they have to be the subject of some proceeding on remand? I believe the answer is no, Your Honor, where, as here, none of this ultimately, at the end of the day, could have undermined confidence in the 12 counts of conviction against Mazzarella. Mazzarella ran this thing with Grimm, her then-husband. Skip Young testified, supplemental excerpts of record at 52, that he, quote, did fraudulent transactions for Eve Mazzarella. When Chad Lucelle, the straw purchaser in Count 12, they were talking about him, and they said Chad doesn't make enough money to qualify for a 100 percent financing loan, quote, Eve's response was, we'll give him a title. Here at Distinctive Real Estate and Investment. And when they, the lenders, called to verify his employment income, I'll take the phone call myself and verify it. We also have. So it seems that if we think there's a Fourth Amendment violation, I feel like we would need to figure out whether any of that evidence or how they found that evidence they found through these documents, that we need to figure out which ones they were. But can I back up for a second? Are you familiar with the case of the United States v. Jenkins from the Fifth Circuit that talked about our Reed test, about whether someone's acting as an agent of the government, not mattering where an employee could consent to a search? I am not, Your Honor. How about Ziegler from this Court? I have read that, but I'm, cannot. It's also about expectations of privacy and when another employee can, basically, give material from an office to the government. There it was, it was computer searches. Correct. Correct, Your Honor. And there's no evidence here. And Kim Brown certainly didn't say anything to the effect that she jimmied the lock of any secret Eve Mazzarella file drawers and extracted whatever she extracted, copied it, and turned it over to the government. As far as the FBI agent is concerned, she brought some investor files. Again, Your Honor, and I understand the Court's concern with this issue, and I'd be happy to answer any other questions that the Court has. I have another question on the Brady. On Brown's testimony about Count 11? Yes, Your Honor. Is there any other witness that testified to the same information that Brown testified to as to Count 11? Because I don't see how there's anything that we could, if we had to strike Brown's testimony because of the, if we thought there was a Brady violation as to Brown, I don't see how Count 11 can stand. That may be, that may well be the case, Your Honor. But, again, I would urge the Court not to strike that count. What we have here is part of the pattern and practice of this overall, ongoing fraud that she and her then-husband headed. This is a textbook way in which they did it. They get people who can't qualify for these loans. They misrepresent their intent to occupy, their net worth, their income, their job title. They obtain the loan fraudulently, transfer it to the LLC, and off we go. Your Honor, I believe Your Honor is correct that if Brown is stricken, Count 11, one of the five mail fraud counts, four against Eve Mazzarella, would drop out of the case. I also had a question about the sentencing hearing. Yes, Your Honor. So do you agree that there was procedural error in the sentencing? No, Your Honor. I agree that the district court in this case did not formalistically recite. I find that based on the evidence the government submitted, which in Mazzarella's case was clerk's record 428, was in fact $52 million, which was worth a plus-24 level enhancement. The district court did not go through that. The district court did not go through that. And didn't he have to under Treadwell? Technically, Your Honor, is correct. But remember what happened in this context. The district court came out and said, white-collar fraud is very serious. But in this case, and the district court plainly crediting Mazzarella's sentencing memorandum, the argument that was in that sentencing memorandum, at some point, these losses become ridiculous. At some point, we're turning her into a murderer. And the district court said, and this is not fair. I do not intend to apply the loss enhancements in this case because they're not reasonable. Now, at that point, the defendant recognized perfectly well what was coming and did not spring to her feet and say, wait a minute, under Treadwell, Your Honor, is necessarily required to perform this exercise, and then state the facts. But they had already said in their brief that the judge had to do that under Treadwell. So they had made the argument. Yes, Your Honor. They made the argument, but their arguments in some total would have resulted in peeling seven levels off the total offense level 43. They said we should have gotten a plus 20 instead of a plus 24. We should have only gotten plus 3 for aggravated role instead of plus 4. And you shouldn't have given us the two-level enhancement. That's seven levels left. That would have taken them down to total offense level 36. That would have been a guideline range from 188 to 235. It's still 20 months below that. But is there any ---- But did the Court ever set a guideline range? No, Your Honor, the closing ---- I'm willing to assume that I can understand why a court would say these damage figures for enhancements go too far. But doesn't the Court still have to set a guideline range and then do whatever the Court wants to do after that? Your Honor is correct. And I would respectfully submit that the closest the district court got in this case was excerpts of record page 98, where the district court said, based on a total offense level of 43 and a criminal history category 1, the guideline range is life. The district court did not expressly make the findings, did not expressly run through the calculations. That's a matter of record. And do we have any case that says that failing to go through the procedural steps that are required can be harmless if the sentence is lower than the range? I couldn't find one. I mean, we have Acosta-Chavez that says that if the ---- even when the judge says I would do the same thing, it's not harmless and it has to be done again. Understood, Your Honor. But I would respectfully submit that given defendants' nonobjection to this, realizing that the guidelines were arguably, at least according to the PSR life, when the district court said I'm not going to apply them, the district court, the defendant, was obligated to lodge some form of objection. And failing to do that brings it into plain error. So do we have a case that says that if you filed a brief saying you have to take these procedural steps, that you then have to repeat that argument orally? No, Your Honor. But I think even if you put it in a pre-sentencing brief, we still look at the overall question of whether this impacts, and under the fourth prong of plain error review, which is a discretionary prong. Well, the question is whether we're in plain error review. I would respectfully submit that we are. I understand, Your Honor, may have some doubts in that respect. But I believe that the sentencing memorandum talks about, on sentencing memorandum pages 14 to 15, says you should have only given me $20 million worth of loss. You should have only made it plus 20 instead of plus 24. The district court made it abundantly clear that the 168-month sentence was based on the 3553a factors, the arguments of defense counsel, which the district court accepted, and all of the arguments of counsel considered the testimony of Mazzarella's witnesses at the sentencing hearing. All of this was performed. I don't see the district court changing its mind on remand after performing the exercise prescribed by the precedent. Okay. Assuming that's true, does that mean you think we should not tell the district court that it is supposed to set a guidelines range? I believe that in affirming the judgment in sentence, this Court might want to mention it. I actually have one other question on another subject. So on the issue of the evidentiary ruling about the money going into the bank account for the LLCs or DREI and then going into her account, is there any element of any of these crimes that required the government to prove that the money went into Mazzarella's account instead of just into a company that she controlled? I don't believe that's an element of any of the fraud convictions, Your Honor. Those require an intent to defraud and intent to deceive. But as a practical or which is intent to deceive, but as a practical matter, you have to show she or something she controlled received it, or else we're not going to be able to establish our burden of proof. But didn't the government have that once it showed that the money got to DREI? It didn't need to show that it then went into her account. I believe Your Honor is talking about the George Swartz ruling. And in that case, the district court struck a fair balance and stopped a mini-trial on the irrelevant issue of the fact that Mazzarella did make some valid, legitimate dispersals. And I put a footnote in the first answering brief saying that the district court did say, okay, you can ask Daniel Marsh, the FBI agent, what happened next. And you could take it one step after the deposit. And Mazzarella's attorneys took full and fair opportunity to exploit that and show there were some good faith and legitimate transactions made. Roberts. Okay. Thank you, counsel. We appreciate your argument. And we'll hear from you. You have a little over two and a half minutes left. Thank you, Your Honor. Let me just make a couple of quick points. First, Your Honor, on your question about Ms. Brown's authority to consent. It's a third-party consent issue. Our position certainly would be that she did not have the authority to consent to the conveyance of the documents outside of the offices of Ms. Mazzarella. It would be the government's burden to prove consent, and there's never been any sort of factual inquiry on that. So to the question of Ms. Brown's authority to consent, it's a third-party consent issue. But I would say that Ms. Mazzarella gave Ms. Brown access to the documents as an employee. She never gave her permission to copy the documents and take them out of the office and turn them over to someone else. In fact, Mr. Mark testified that she would have gone insane if she had known that was going on. So I don't think Ms. Brown had that kind of authority, but at a minimum, it's a factual question that could be part of a hearing on remand to the extent the Court thinks that it's important. Let me talk for a second about what I'll call the greed evidence, which Your Honor brought up. The government wanted to show that the evidence went beyond Ms. Mazzarella's company and into her personal account, not because it was part of its burden of proof, but because it wanted to be able to argue to the jury, as it did, that she was greedy and lining her pockets. The reason it was important to then show that the money went out of her personal account and back into these the defense had maintained all along that she was doing, which is taking this money and putting it into the properties. But what the judge allowed was to the extent the money went from her company account into the properties, that was okay. But to the extent there was an extra step and the money went into her from her company account to her personal account and then into the properties, for some reason, which I think is an abuse of discretion, that was off-limits. And so the government was able to put that money into her personal account and argue that it was greed and even say that there was no evidence to show that the money went back into the properties. And, of course, there was no evidence because Ms. Mazzarella was prevented from presenting that evidence. I'd like to just say one thing about Brady, and this goes to materiality, and it has to do with incentives. Most prosecutors do the right thing. They don't need any incentive. They just do the right thing because it's the right thing. There are prosecutors, though, who don't do the right thing, who don't take Brady seriously. And if this Court says in this or other cases that it's okay to not discover impeachment information for four separate prosecution witnesses, my view as a defense lawyer who practices every day in the courts, you're sending exactly the wrong message. You're telling prosecutors it's okay because we know there is no other sanction of any kind except reversal of convictions. There's no professional, there's no bar discipline, there's no internal discipline. There is reversal or there's nothing. And if the Court says it's okay to not turn over impeachment material for four separate witnesses, I respectfully suggest that that sends a terrible message about Brady. Roberts. Okay. Thank you very much, counsel. We appreciate your arguments in this case. The case just argued will stand submitted.
judges: Gould, Watford, Friedland